UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERRY W. TRIPP, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01457-JPH-MJD |
| | ) | |
| STANLEY KNIGHT, | ) | |
| AGNES OPUKU, | ) | |
| MITCHEFF, | ) | |
| RIPPETOE, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY GRANTING MEDICAL DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

For the reasons explained in this Entry, the motion for summary judgment filed by NP Agnes Opuku, Dr. Daniel Rippetoe, and Dr. Michael A. Mitcheff (together "the Medical Defendants"), dkt. [49], is **granted.**

## I.  BACKGROUND

Terry W. Tripp, Sr. is a prisoner confined at all relevant times at the Plainfield Correctional Facility ("Plainfield"). He brings this 42 U.S.C. § 1983 civil rights action against several defendants, alleging that he has been denied certain medications while incarcerated at Plainfield. He alleges that the Medical Defendants have refused to prescribe medications that would help him. Dkt. 6 at 2 (Entry Screening Complaint). The Medical Defendants's motion for summary judgment is fully briefed.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

### III. DISCUSSION

#### A.    Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Tripp as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Mr. Tripp initially arrived at the Reception and Diagnostic Center ("RDC") from the Marion County Jail ("the Jail") on or about December 26, 2018. Dkt. 51-5 at 1-3. On December 27, 2018, Mr. Tripp had an initial chronic care visit with Nurse Practitioner ("NP") Loice Mukona in which he was seen regarding hypertension, seizures, and complaints of back pain. *Id.* at 4-7. He was prescribed Tylenol, Keppra, Mobic, and Trileptal 150mg. *Id.* He also had a mental health assessment, during which he reported a history of depression, bipolar disorder, antisocial

personality disorder and PTSD. Dkt. 51-2, ¶ 5; dkt. 51-5 at 8-13.

On December 31, 2018, Mr. Tripp had a follow-up appointment with NP Loretta White. Dkt. 51-5 at 14. He told NP White that for ten years he had received Neurontin (brand name "Gabapentin," used interchangeably in this Entry), while incarcerated in the IDOC and he did not understand why he did not have that prescription. *Id.* NP White noted in the medical chart that she told him that Neurontin was no longer prescribed at the facility and that Pamelor or Cymbalta were usually substituted. *Id.* Mr. Tripp told NP White that he had tried Cymbalta before and was not interested in taking that. *Id.* NP White ordered Pamelor (Nortriptyline) for his complaints of pain. *Id.* at 15. He also had a current prescription for Trileptal. *Id.*

On January 23, 2019, Mr. Tripp was transferred to Plainfield. *Id.* at 20. Agnes Opoku is a NP licensed to practice in the State of Indiana. Dkt. 51-1, ¶ 1 (Affidavit of Agnes Opoku, NP). Since May 7, 2018, she has been employed by Wexford of Indiana, LLC ("Wexford") at Plainfield. *Id.* at ¶ 2.

NP Opoku first saw Mr. Tripp on January 29, 2019. Mr. Tripp told her that he had been taking Gapabentin for seizures since 2015 but was taken off it when he was at the Jail and that he had had two seizures in the past two weeks. Dkt. 51-5 at 28.

NP Opoku noted he had current prescriptions for Keppra and Trileptal, which were given in combination for treatment of seizures and chronic pain. Dkt. 51-1, ¶ 8. They discussed potential dosage alterations and he indicated that he wanted something stronger for his seizures and pain. *Id.* He repeatedly informed NP Opoku that only Gabapentin and Keppra would work for his seizures, but she informed him that in her opinion that was not an appropriate prescription. *Id.* He became upset and cursed at her when leaving the office stating he was going to speak with the

medical director. *Id.* NP Opoku ordered labs, continued prescriptions for Keppra, Lisinopril, Nortriptyline, and Propranolol, as well as his continued prescription of Trileptal for pain. *Id.*

NP Opoku's decision to not prescribe Neurontin to Mr. Tripp was based on several factors. *Id.* at ¶ 9. First, Mr. Tripp appeared to ambulate well and did not appear to have any serious or significant nerve related injury. *Id.* He reported ongoing pain, but there were no objective findings during her assessment that made her believe he had any serious abnormality that would require an ongoing prescription of Neurontin. *Id.* Second, he had been assessed by mental health staff just prior to her visit, during which Mr. Tripp reported an extensive history of substance abuse, including prior daily use of heroin and methamphetamines. *Id.* In NP Opoku's experience, and based upon current literature, it is a potential deviation from the applicable standard of care to prescribe a medication such as Neurontin/Gabapentin with habit-forming tendencies to a patient with a significant history of substance abuse and addiction. *Id.*

Third, the use of Neurontin/Gabapentin had become increasingly discouraged for use as a treatment for chronic pain due to significant amounts of diversion, abuse, and trafficking in the corrections setting. *Id.* NP Opoku had at her disposal a number of alternative treatments for chronic pain, such as anti-epileptic medication, low dose anti-psychotic medication, anti-inflammatories, acetaminophen, and other options, which come with less concern and risk for diversion and misuse. *Id.* Moreover, Mr. Tripp did not arrive at Plainfield with a current prescription of Neurontin. Given these factors, NP Opoku did not believe that it was appropriate to prescribe Neurontin for Mr. Tripp.

NP Opoku saw Mr. Tripp again on February 26, 2019, to discuss medication. Dkt. 51-1, ¶ 12; dkt. 51-5 at 40-42. NP Opoku inquired as to why he was not taking his morning pain medication. *Id.* He informed her the med line was too early and he did not always hear them call

out the med line. *Id.* Once again, he told her that he had taken Gabapentin and Keppra since 2005 and they had helped him. *Id.* He said that the Pamelor did not help and he believed it was causing a chemical imbalance in his brain, but he did not want it discontinued. *Id.* He also said he was angry all the time because of his uncontrolled pain. *Id.* He said that a motor vehicle accident in 2002 caused him to have seizures, which is why he was given Gabapentin. *Id.*

He told NP Opoku that he had tried Mobic, Tylenol, Ibuprofen, and Naproxen, but none of them worked. *Id.* He said Flexeril gave him some relief. *Id.* He also told her that he had written Dr. Mitcheff about his pain but had received no response. *Id.* Given his complaints of acute discomfort, with anger, NP Opoku ordered a 7-day prescription of Flexeril 5mg but noted that he was medication noncompliant because he did not take his morning doses. *Id.* NP Opoku continued the prescriptions for Keppra, Nortriptyline, Propranolol, and Trileptal for control of seizures and pain. *Id.* NP Opoku's opinion regarding Neurontin remained unchanged during her visit of February 26, 2019, as she did not believe it was an appropriate prescription given Mr. Tripp's presentation and complaint of symptoms. Dkt. 51-1, ¶ 13.

The following day, Mr. Tripp was assessed by a Physician's Assistant ("PA") Sheri Wilson where he again became angry and stormed out of the office because he could not get a prescription for Neurontin. She noted he was exhibiting drug-seeking behavior. *Id.*; dkt. 51-5 at 43-45.

On March 5, 2019, Mr. Tripp was evaluated by NP Loretta Dawson. He was again requesting Neurontin and became angry with NP Dawson when she would not prescribe Neurontin. He got up and left the office. Dkt. 51-1, ¶ 14; dkt. 51-5 at 49-51. She also noted a history of substance abuse based on her review of the records. *Id.* It became so contentious that NP Dawson asked that a correctional officer be present, and as Mr. Tripp left, he told NP Dawson to "kill yourself." *Id.*

On March 11, 2019, medical staff received the results of Mr. Tripp's lumbar thoracic spine x-rays, which returned normal with no sign of any abnormality. Dkt. 51-1, ¶ 15; dkt. 51-5 at 52. That same day, Mr. Tripp had a chronic care visit with NP Finote Asfaw, in which he was seen for hypertension, hepatitis and seizures.  NP Asfaw did not make any changes to his pain medication. Dkt. 51-1, ¶ 16; dkt. 51-5 at 53-56.

That same day, Mr. Tripp was also assessed by Dr. Duan Pierce. Mr. Tripp complained of low back pain. Dr. Pierce did not prescribe Gabapentin and instead continued the current prescriptions for pain medication, which included Nortriptyline, Trileptal and Tylenol. Dkt. 51-1, ¶ 17; dkt. 51-5 at 57-59. Dr. Pierce recommended physical therapy to increase range of motion. Dkt. 51-5 at 58.

On March 21, 2019, Mr. Tripp was again seen by PA Wilson, demanding Neurontin. PA Wilson noted that Mr. Tripp was argumentative and failed to acknowledge his problem with substance abuse. Dkt. 51-1, ¶ 18; dkt. 51-5 at 60-62. Mr. Tripp admitted to buying suboxone, Nueurontin, and other pills from other inmates because medical staff were not giving him what he wanted. *Id.* He told her that Neurontin was the only thing that worked to prevent his seizures. *Id.* He was not taking the Pamelor as prescribed. Instead he cheeked the medication in the medication line and then took it one at a time on a schedule he decided. *Id.* Mr. Tripp was told he must lose weight, stop buying other medications from other inmates, and demonstrate compliance with the medications that were prescribed. *Id.*

Mr. Tripp next saw PA Wilson on March 29, 2019. He again admitted he was not compliant with his morning medications, stating that he would not and could not get up at that time. Dkt. 51-1, ¶ 19; dkt. 51-5 at 64-66. PA Wilson told him that additional changes would not be made to his medications until he was compliant. *Id.*

6

During a visit with PA Wilson on April 22, 2019, Mr. Tripp told her he was only taking the Keppra once a day and that it was keeping him from having seizures, so she changed the order to once a day. Dkt. 51-5 at 71-73. She also stopped the Pamelor because he was not taking it. *Id.* He said he was still buying suboxone from other inmates. *Id.* She counseled him against taking medications from other inmates because he could not know what was in them. *Id.*

On April 25, 2019, Mr. Tripp told PA Wilson that the only combination of medications that worked for him were Neurontin and Wellbutrin. Dkt. 51-1, ¶ 21; dkt. 51-5 at 75-78. She counseled him that taking the Keppra only once a day might not prevent seizures, but he said he would not get up for the morning medicine line. Dkt. 51-5 at 75. PA Wilson noted that at his last visit she offered a time-release Dilantin but he refused that. *Id.* Mr. Tripp admitted that he was buying illicit medication from other inmates and was noncompliant with the medications that were prescribed. *Id.* In the chart, PA Wilson listed the history of Mr. Tripp's medications since he was first incarcerated in 2006. *Id.* It appeared that Wellbutrin was started in 2012 and Gabapentin/Neurontin was started in 2015. *Id.* Both were stopped in 2017. *Id.*

NP Opoku saw Mr. Tripp on May 15, 2019, for complaints of neck pain. Dkt. 51-1, ¶ 22; dkt. 51-5 at 79-83. She ordered x-rays of the neck and encouraged him to do stretching exercises and apply warm or cold compresses as needed. *Id.*

In NP Opoku's opinion, given Mr. Tripp's reports of buying/trading medication, substance abuse, and drug-seeking behavior, it would be a deviation from the applicable standard of care for her, or other members of the medical staff, to have prescribed Mr. Tripp Neurontin throughout 2019. Dkt. 51-1, ¶ 30.

Mr. Tripp saw NP Asfaw on September 9, 2019, requesting stronger pain medication. However, she noted that there was no compelling reason to give stronger pain medication at this

time, as he had been seen multiple times for the same issue and he appeared to be dictating what he should be prescribed through manipulation and intimidation. Dkt. 51-1, ¶ 24; dkt. 51-5 at 100-102.

On September 20, 2019, Mr. Tripp was assessed by Dr. Pierce for chronic low back pain. Dr. Pierce noted that there was no indication for long-term medication like Gabapentin or Pamelor and that instead Mr. Tripp should perform low back exercises, keep well hydrated, and take Tylenol and Mobic (anti-inflammatories) for the next three (3) months. Dkt. 51-1, ¶ 22; dkt. 51-5 at 108-110. X-rays done in November 2014 and March 2019 showed no degenerative changes in his lumbar spine and Dr. Pierce's review of the medical records did not indicate any significant disease in Mr. Tripp's lumbar spine. *Id*. Dr. Pierce assessed Mr. Tripp's range of motion and ability to stand on one leg, walk on toes, and walk heel to toe. Dkt. 51-5 at 110.

Daniel Rippetoe, M.D. is a psychiatrist licensed to practice in the State of Indiana. Since May 21, 2017, he has been an independent contracting psychiatrist who has provided psychiatry services to several patients throughout the IDOC in coordination with Wexford. Dkt. 51-2, ¶¶ 1-2 (Affidavit of Daniel Rippetoe, M.D.).

Dr. Rippetoe first saw Mr. Tripp through tele-psych on January 4, 2019, while he was still at the RDC. Dkt. 51-2, ¶ 6; dkt. 51-5 at 16-19. Mr. Tripp denied any suicidal or homicidal ideation and reported an extensive history of prior substance abuse and that he had previously received mental health medication. *Id*. Given his reported symptoms, as well as his history of a seizure disorder, Dr. Rippetoe prescribed Celexa, which is a selective serotonin reuptake inhibitor that can be used for reducing anxiety and depression. *Id*.

Dr. Rippetoe next saw Mr. Tripp on February 19, 2019. Dkt. 51-2, ¶ 8; dkt. 51-5 at 34-37. Mr. Tripp reported that Celexa was ineffective, and he made a specific request for Wellbutrin. *Id*.

8

However, Dr. Rippetoe was not comfortable with the prescription of Wellbutrin given concerns for abuse and Mr. Tripp's seizure disorder. *Id.* Dr. Rippetoe offered Mr. Tripp a prescription of Zyprexa 5 mg, as he had reported some increased agitation, and it was Dr. Rippetoe's hope that Zyprexa may address that agitation. *Id.* Zyprexa is an anti-psychotic medication and given Mr. Tripp's reports of depression, Dr. Rippetoe believed it was a more appropriate prescription. *Id.* Dr. Rippetoe also had concerns regarding potential interactions with other medications that had been ordered by his primary care physician, including Pamelor, Trileptal and Keppra. *Id.*

Dr. Rippetoe saw Mr. Tripp again on March 5, 2019. Dkt. 51-2, ¶ 9; dkt. 51-5 at 46-48. Mr. Tripp continued to report depression, so Dr. Rippetoe continued his prescription for Zyprexa, and again noted his other prescriptions of Pamelor, Trileptal and Keppra. *Id.*

On April 17, 2019, Mr. Tripp received a full mental health assessment by psychologist Richard Thayer. Dkt. 51-2, ¶ 10; dkt. 51-5 at 67-70. Dr. Thayer noted that Mr. Tripp was specifically requesting Wellbutrin or Buspar, reported a history of meth and heroin use that made him feel peaceful, and generally had a history of being tense and rude to everyone. *Id.* Dr. Thayer noted that Mr. Tripp had significant anxiety. *Id.*

Mr. Tripp saw Dr. Thayer again on April 24, 2019 and May 16, 2019. Dkt. 51-2, ¶ 12; dkt. 51-5 at 74, 84-86. On May 16, 2019, Mr. Tripp reported "self-medicating" by buying Gabapentin from other inmates. Dkt. 51-5 at 85.

Dr. Rippetoe next saw Mr. Tripp on May 23, 2019. Dkt. 51-2, ¶ 13; dkt. 51-5 at 87-89. They discussed medication options, and despite Mr. Tripp's request for Wellbutrin, Dr. Rippetoe still believed his current medications were appropriate, especially given the other prescriptions from his primary care physician for pain (Trileptal, Keppra). *Id.* Dr. Rippetoe continued the prescription of Zyprexa 5 mg. *Id.*

During a visit with Dr. Thayer on May 28, 2019, Mr. Tripp reported that for the past two weeks he was no longer taking his medications and he felt completely free of anxiety and depression. Dkt. 51-2, ¶ 14; dkt. 51-5 at 90-92. Mr. Tripp met with Dr. Thayer again on June 6, 2019, expressing that he wanted to have his mental health classification code changed to try to reduce his time in the IDOC. Dkt. 51-2, ¶ 15; dkt. 51-5 at 93-95. Mr. Tripp was argumentative but respectful. *Id.*

Dr. Rippetoe saw Mr. Tripp again on June 25, 2019. Dkt. 51-2, ¶ 16; dkt. 51-5 at 96-98. Again, Dr. Rippetoe did not believe he required a prescription for Wellbutrin, as it was contraindicated, and he continued to prescribe Zyprexa for agitation. *Id.*

Dr. Rippetoe next saw Mr. Tripp on September 19, 2019. Dkt. 51-2, ¶ 17; dkt. 51-5 at 103-107. Mr. Tripp reported that Zyprexa had been ineffective, and he no longer wished to take it. *Id.* Dr. Rippetoe discontinued Zyprexa but provided an alternative, Remeron 15 mgs. *Id.*

Dr. Rippetoe's prescriptions for medication were based upon his clinical judgment. Dkt. 51-2, ¶ 20. It is Dr. Rippetoe's opinion that although Wellbutrin is an available medication used to treat depression, over the course of the last several years its use as treatment for chronic or ongoing depression has become more disfavored, especially for patients with a history of substance abuse and addiction. Dkt. 51-2, ¶ 21. Moreover, Wellbutrin is contraindicated for patients with a seizure disorder. *Id.,* ¶ 22. Mr. Tripp reported seizure activity while at RDC, and as such, Wellbutrin was medically contraindicated for him. *Id.* In Dr. Rippetoe's opinion, the standard of care would not require or encourage a prescription of Wellbutrin, especially given Mr. Tripp's history of substance abuse and documented seizure disorder. *Id.,* ¶ 24.

On September 24, 2019, Mr. Tripp followed up with Dr. Thayer, reporting that the Zyprexa was making him feel too lethargic, but so far with his new medication he felt good and in control

10

of himself. Dkt. 51-2, ¶ 18; dkt. 51-5 at 111-113.

Michael A. Mitcheff, D.O. is a physician licensed to practice medicine in the State of Indiana. Since July 2018, he has been employed by Wexford as the Regional Medical Director for the State of Indiana. Dkt. 51-3, ¶ 1-2 (Affidavit of Michael A. Mitcheff, D.O.). Mr. Tripp is suing Dr. Mitcheff because in his opinion Dr. Mitcheff wouldn't help him. Dkt. 53-2 at 12. He recalls sending Dr. Mitcheff letters but did not have any face-to-face interaction with Dr. Mitcheff. *Id.*

Dr. Mitcheff does not recall receiving any correspondence from Mr. Tripp regarding the care and treatment he received at Plainfield. Dkt. 51-3, ¶ 4. Mr. Tripp has no knowledge of whether Dr. Mitcheff actually received any of the letters he sent him. Dkt. 53-2 at 13-14.

It is Dr. Mitcheff's opinion that the different pain medications, including Pamelor, prescribed by NP Opoku to address Mr. Tripp's complaints, are FDA approved for the treatment of chronic pain. Dkt. 51-3, ¶ 9. Pamelor has fewer concerns for abuse than Gabapentin. *Id.,* ¶ 14. Gabapentin (also known as Neurontin) is an anti-epileptic medication that is also FDA approved for the treatment of chronic nerve pain. *Id.,* ¶ 11. While it does not fit in the category of medications commonly known as "opioids," it is still a strong and powerful medication. *Id.* In Dr. Mitcheff's opinion, this medication should be used as a last resort in patients with a history of substance abuse. *Id.* In correctional medicine it is important to always try to do what is in the patient's best interest for long term recovery. *Id.* There are so many alternatives for chronic neuropathic pain that Mr. Tripp's insistence on having Gabapentin makes Dr. Mitcheff suspicious about his commitment to recovering from addiction. *Id.*

It is also Dr. Mitcheff's opinion that in the world of corrections, as well as in the general community, abuse and addiction to Gabapentin has significantly increased over the last several years, as its rate of prescription increased, as it was initially considered a safe alternative for

patients who had been receiving opioids for chronic pain. *Id.,* ¶ 12. The medical community now knows that this medication has some of the same addictive tendencies as opioids. *Id.* Gabapentin is now a drug that must be entered in INSPECT Indiana so its use can be tracked. *Id.* Gabapentin is now also a controlled substance in many states. *Id.*

Dr. Mitcheff opines that in the case of Mr. Tripp, Gabapentin could be a treatment option for his complaints of chronic pain, but long-term use of Gabapentin, given his history of substance abuse and addiction, is extremely problematic and not in his best interest. *Id.,* ¶ 13. The primary concern with the long-term use of Gabapentin for treatment of chronic pain for a patient like Mr. Tripp is that the medication would either be abused, trafficked, or would be counter-therapeutic to attempts to overcome a history of addiction and substance abuse. *Id.* In essence, the practitioner would be providing a medication that would feed into the same addictive tendencies that led to the substance abuse prior to incarceration. *Id.* In addition, Mr. Tripp has admitted to buying/trading medications behind the walls, which is an extremely difficult issue faced by practitioners and custody staff at facilities throughout the state. *Id.*, ¶ 15.

**B.    Analysis**

Mr. Tripp has been a convicted prisoner at all relevant times. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v.*

*Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

The Medical Defendants do not suggest that Mr. Tripp did not suffer from objectively serious medical conditions. Therefore, the Court will consider only the subjective prong of the deliberate indifference claims.

### 1.    Claim Against Dr. Mitcheff

 As noted, Mr. Tripp believes that Dr. Mitcheff should have helped him obtain treatment for his pain. "Individual liability under § 1983... requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary."). "Only someone personally responsible in a constitutional violation can be held liable under [42 U.S.C.] § 1983." *Wojcik v. Cook Cnty.*, 803 F. App'x 25, *2 (7th Cir. 2020) (citing *Wilson v. Warren Cty., Ill.*, 830 F.3d 464, 469 (7th Cir. 2016)).

Here, Mr. Tripp does not allege that he was ever seen or treated by Dr. Mitcheff. There is no evidence that Dr. Mitcheff ever received any letters from Mr. Tripp. In addition, there is no evidence that Dr. Mitcheff was consulted by other medical professionals regarding Mr. Tripp's

treatment. No reasonable jury could find that Dr. Mitcheff was deliberately indifferent to Mr. Tripp's medical conditions. Because Dr. Mitcheff did not participate in Mr. Tripp's care, he is entitled to judgment as a matter of law.

### 2.    Claims Against Defendants Opoku and Rippetoe

Mr. Tripp alleges that NP Opoku was deliberately indifferent to his pain. He told her what medications had worked in the past and that what she was prescribing was ineffective, but she refused to prescribe what had worked in the past. Similarly, Mr. Tripp alleges that Dr. Rippetoe refused to prescribe Wellbutrin for his depression.

The facts in this case are essentially undisputed. Mr. Tripp wants certain specific medications, Wellbutrin and Neurontin because they were the most effective for him, but NP Opoku and Dr. Rippetoe have not provided them. At various times in the past, Mr. Tripp did receive Wellbutrin and Neurontin, but not since 2017. He contends that although he has tried many different medications, none have been effective.

NP Opoku and Dr. Rippetoe base their argument on the principle that an inmate does not have a constitutional right to demand specific medications or treatment. *Arnett,* 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm."). Mr. Tripp argues that medical providers can nonetheless be found to be deliberately indifferent when they continue to knowingly provide treatment that is ineffective. *Petties*, 836 F.3d at 729-730 (a prisoner may show deliberate indifference by showing that a medical provider persisted "in a course of treatment known to be ineffective.").

"The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional

standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (where prisoner wanted different treatment because his medications were not helping, his disagreement with the physician did not allow him to prevail on his Eighth Amendment claim where the physician's choice of treatment was not blatantly inappropriate); *see also Black v. Wexford of Indiana LLC*, No. 1:19-cv-02207-JPH-MJD, 2021 WL 119147, at \*2 (S.D. Ind. Jan. 13, 2021) (denying motion for preliminary injunctive relief regarding denial of Gabapentin and declining to second-guess doctors' refusal to prescribe the medication because it is often abused in prisons and plaintiff had a history of substance abuse).

Here, NP Opoku and Dr. Rippetoe considered Mr. Tripp's requests for Wellbutrin and Gabapentin and exercised their professional medical judgment in refusing to prescribe those medications. NP Opoku was aware that Mr. Tripp reported an extensive history of substance abuse. Based on her experience and current literature, she determined that the applicable standard of care cautions against prescribing Neurontin/Gabapentin to a patient with a significant history of substance abuse and addiction. In addition, in correctional settings, because of significant amounts of diversion, abuse, and trafficking, the use of Neurontin/Gabapentin has become increasingly discouraged as a treatment for chronic pain. The concern that Gabapentin has habit-forming tendencies was reinforced by Mr. Tripp's constant requests for that medication, and Mr. Tripp was offered several other medications for his seizures and pain.

Dr. Rippetoe decided not to prescribe Wellbutrin for depression because it is contraindicated for patients, like Mr. Tripp, who have a seizure disorder. Instead, Dr. Rippetoe prescribed Celexa, Zyprexa, and then Remeron. Mr. Tripp reported to Dr. Thayer that he felt good on the Remeron. "[M]edical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker*, 940 F.3d at 965 (internal quotation omitted). "Neither

medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

"We defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker,* 940 F.3d at 965 (internal quotation omitted); *see also Gaines v. Corizon Health*, No. 2:16-cv-243-JMS-MJD, 2017 WL 2797720, (S.D. Ind. June 26, 2018) (holding discontinuation of Neurontin not unreasonable where plaintiff had refused blood draw to measure levels of Neurontin in system and plaintiff had documented history of drug abuse while in prison).

A plaintiff "must do more than show that he was not given the very best of treatment; he must show that [a medical provider's] course of treatment was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Jordan v. Milwaukee Cty.*, 680 F. App'x 479, 483 (7th Cir. 2017) (internal quotation omitted) (summary judgment in favor of nurse practitioner affirmed where plaintiff alleged that refusing to prescribe Gabapentin was an impermissible persistence in providing ineffective treatment, but there was no evidence that the treatment provided was not based on accepted medical judgment); *see also Romero Galindez v. Ahmed*, No. 20-cv-00655-JPG, 2020 WL 6487357, at *2 (S.D. Ill. Nov. 4, 2020) (district court denied motion for preliminary injunction where plaintiff sought an order for Gabapentin but medical providers determined that recent medical trends have counseled against the use of Gabapentin for general pain management because it is addictive and has significant side effects). Here, there is no evidence that NP Opoku or Dr. Rippetoe acted outside the scope of accepted medical decision-making.

"[D]eliberate indifference claims based on medical treatment require reference to the *particularized circumstances* of individual inmates." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). "[I]t is implicit in the professional judgment standard itself, …, that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Id*. Here, the defendants had concerns about prescribing Wellbutrin and Gabapentin to Mr. Tripp because of his seizure and substance abuse history. In other words, their treatment plans properly reflected a consideration of Mr. Tripp's particular circumstances.

No reasonable jury could find that refusing to prescribe Neurontin/Gabapentin and Wellbutrin was an unacceptable or unreasonable course of treatment so NP Opoku and Dr. Rippetoe are entitled to summary judgment in their favor.

## IV.    CONCLUSION

The Medical Defendants' motion for summary judgment, dkt. [49], is **granted.**  Final judgment consistent with this Entry, the Entry granting summary judgment in favor of Warden Knight, and the screening Entry of June 13, 2019, dkt. 6, shall now issue.

The plaintiff's motion for case status, dkt. [77], is **granted** to the extent this Entry is issued.

**SO ORDERED.**

Date: 3/19/2021

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

TERRY W. TRIPP, SR.
103679
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Inmate Mail/Parcels
727 MOON ROAD
PLAINFIELD, IN 46168

All electronically registered counsel